Good morning, Your Honors. Robert Palmer, appearing on behalf of the plaintiff, I'd like to reserve three minutes for rebuttal, if I may. You may. I find myself in kind of an odd situation here, because in essence, in order to effectively argue this appeal, I suppose I'd need an hour to give you a closing statement, because that's basically what we're here for. We're here because the district court in this particular case, in resolving the summary disposition matter, rather than applying general standards of summary disposition review, basically tried the case. She acted as a fact finder. She picked and chose amongst the case, amongst the facts, drew inferences from it, and from there concluded that the plaintiff was unable to sustain its burden. I'd like to focus, if I may, essentially on the real issue in this case, and the real issue in this case is, could a finder of fact have found that the reason for Ms. Flones's injury was in fact due to, solely due to the fact that she, this issue giving the blood products, or could they have found that the cause that made a difference, the straw that broke the camel's back, was either her age or the fact that she had filed a retaliation claim less than two months before this event occurred. In reading the briefs this morning, and last night, I noted that, oddly enough, neither side nor the court basically cited the Nassar case, which, as the court knows, last year changed the standard for retaliation, or at least defined the standard for retaliation and indicated that in a Title VII action, it is a but-for standard, similar to the standard that's applied in an age case under Gross. That being said, I would like to, in applying that standard, I would like to direct the court's attention to the recent case of Burridge v. United States. This is a case that was decided just this year, in January of 2014. It was a criminal case. The charge was whether or not an individual had caused death by supplying heroin. But Judge Scalia, in that case, basically had an extensive discussion of what but-for means, and he indicated in that case that the but-for standard applied in that criminal case is the same but-for standard that is applied in age cases, in retaliation cases. He cites the Nassar case, he cites the age case, the Gross case, and basically he offers a lot of clarification as to exactly what is the connection there, then, if you, we know that the complaint, that there was this complaint a couple of months before the final incident. Are you arguing that that alone is enough to make it a but-for cause, or what else do you have that links that, in fact, other than temporally, to the ultimate discharge? Exactly. I'm glad you saved me two minutes to get there. That's exactly where I wanted to get to. The court relied solely on what you have pointed out, which is the two-month period. If you read the district court's opinion, Judge Roberts talks about whether two months is enough, whether two months is that, and it basically comes to the conclusion that all the plaintiff had was the two-month relationship. What the court ignored, and why I think she invaded the province of the jury in this particular case, is first of all, she ignored the fact that it was actually less than two months. The complaint was in the middle of February, the event that led to the surgery was on March 29th, the discipline was on April 4th, so this wasn't a two-to-five month, this was a one-to-two month, it was actually less. She ignored a number of facts in the discipline that are crucial, and those facts include the following. Number one, the surgeon, Dr. Schreck, who complained about the administration of blood products, was very clear in his testimony. He indicated, I didn't want to get her fired, I and my traitor wanted to get her disciplined, I wanted to have a discussion about communication in the operating room. But if it wasn't for the surgeon making all these complaints, the hospital might not have even known about it, right? I agree with you. I agree that that's what started the ball rolling. Right. All the pain about it, you know. That's true. Hospitals have to listen to the surgeons, or the surgeons go elsewhere. Well, I wish the hospital would have listened to the surgeon, because Dr. Schreck did not want this woman disciplined. Schreck's not the decision-maker, right? This is true. The nursing director who made the decision. Schreck started the ball rolling, I agree. He issued a complaint. But he also indicated, I don't want this woman terminated, I want to have a discussion regarding what was ongoing. They are separate departments, aren't they? He's not a supervisor. He's not even an employee. He's not an employee. Okay. So that the... But he makes a generalized complaint, then they turn him out of the process. Well, it's not a generalized complaint, it's a specific complaint about this incident, which as you said, it is the third. Right. But then what happens... In a usual, not usual, but frequently in retaliation, you have the incident here, and then they're fired here. Here you've got several things, then the complaint, then the firing, with the third incident, right? I don't disagree with you. But that's what starts the ball rolling. But then when the ball gets rolling, Mary Galinsky, the head CRNA and the culprit here, the woman who initially told Ms. Flonis that she, was she too old to work 16 hours, and the woman who Ms. Flonis complained about, takes the complaint made by Dr. Schreck and changes it. She extrapolates it and increases it, and the original complaint that got Ms. Flonis fired included all, a whole other paragraph about improper drugs being given, not monitoring the blood pressure, so she enhances the complaint, number one. She doesn't conduct, they never talk to Ms. Flonis. They never allow Ms. Flonis to talk to Dr. Schreck, Dr. Macon, or any of the people involved in the situation. So in essence, based upon a complaint, we had a problem here, it turns into a two-pronged attack, there's no investigation done, Ms. Flonis is never talked to. When you say, just help me on the words, I think you said, she takes the complaint, but I thought part of your submission was that Schreck had not filed a complaint. He said that he went to the people in the operating room and had a discussion with them because he wanted to make sure this type of situation didn't happen again. These people are who? The anesthesiologist, the MDA, Mary Golinski, the head of the CRNAs, the head of the nurses.  He was, yeah, he spoke to Golinski, and we, although Ms. Golinski did not recall the specific discussion. This was an oral complaint, you're talking about? This was an oral complaint, he didn't file anything, he didn't file anything in writing. He said, this happened, I don't want this to happen, and it was from there that Ms. Golinski authored a lengthy document that included complaints regarding her anesthesia care, which ultimately got removed as part of, in the grievance process. So she overstated her case, she didn't interview Ms. Flonis. Removed in the grievance process, removed by whom, in what way? The way it worked is she was given a level three performance improvement plan, a call for termination. The original document, and you'll see in the record, the document that's attached is the amended one. The original document had a second charge that basically said she gave the wrong drugs, she didn't monitor the blood pressure properly. It was a whole page of an attack on her anesthesia care. She, Ms. Flonis, grieved that termination, and the parties above, the panels and councils that heard that grief and says it worked through the hospital hierarchy, ended up removing all of that charge and leaving the charge with the sole charge of giving the blood product. So the ultimate basis for her termination was, in fact, the incident that occurred with respect to the blood transfusion. Correct. That is their basis. Administering the wrong drug, I assume, came out of the second incident that resulted, that ended up with a level two performance plan, right? That's true. And to be honest with you, I can't take any issue with that particular event. I mean, Ms. Flonis testified her ex-husband was dying and she wasn't on her game, but she did it, and discipline was appropriate, and we've always taken the position that that discipline was appropriate. Even though it was not ultimately a basis for her termination, it did, in fact, happen that she administered the wrong drug. Earlier, she did, yes. We don't take issue. We take issue with the cell phone incident because other people listen to their iPhones during, you know, there's three incidents. It still wasn't permitted, was it? Well, that's a tough question to answer. There was a dichotomy of testimony as to whether they knew about it. Whether there was a specific rule or not, good judgment would dictate that you wouldn't be using your personal cell phone while you're taking care of a patient, right? I agree, but she wasn't taking care of a patient. That was her argument. I mean, if we want to, what happened is the woman was in a waiting room, waiting, and she was alone, and she had already been given all her administrative, all her care, and the woman was lonely, and Melissa Flonis saw her there and thought, I don't want her sitting here, so I'll sit here so she doesn't feel that she's all alone. She wasn't providing any care other than sitting with the patient before surgery so she wouldn't be apprehensive, and she looked on her PDA and was looking up medical terms for another person there. She was on Hippocrates, which is a medical situation, and she was given an actual performance improvement plan for that, whereas another employee who was caught... The patient obviously did not appreciate her friendliness. Well, apparently the patient was put off for some reason. I mean, that complaint was never... There was a statement that she made an anonymous complaint months before. Nobody's ever seen that complaint, but assuming she did, assuming she did, but the odd thing of that is another woman who was actually listening to her iPod during the course of a surgery, a younger woman, received a verbal counseling for that, and if you were going to put them on a continuum of relative, I guess, severity, it would seem to me that somebody performing surgery with an iPod in it is worse than a person who's babysitting who happens to be checking out a medical term, and it was a different type situation. I see that my... I should sum up. The only final point I wanted to make is that there's actually a question of fact as to whether or not she violated procedure in what happened in the operating room. There was an affidavit from another CRNA. There was testimony from the circulators that this kind of tacit approval is something that goes on all the time, and Melissa Flonis, as discovery would reveal, is the only person that's ever been disciplined by Bon Secours for giving blood products during a surgery, so they picked and chose her to enforce the rule. Your time has expired. Thank you. You'll have three minutes for rebuttal. Thank you. Good morning, Your Honors. Regan Dahl on behalf of William Beaumont Hospital. There are two very important facts that are not in dispute in this case. The first one is that, as Judge Gibbons noted, plaintiff, Ms. Flonis, administered the wrong medication to a patient through the epidural. She was, as counsel just acknowledged, she was rightfully issued discipline because of that. They were fortunate it got stopped, though, before it started. They were, Your Honor. She was about to, and it didn't happen. Right. It was in the tube, and there's like a little stopcock before it actually enters the patient, and that had yet to be turned. So, it was sitting in the tube but hadn't gotten to the patient yet, as far as everyone can tell. But there was no adverse outcome with the patient, yes. The second fact that is not in dispute is, and it can be seen through plaintiff's testimony, is she admitted that she ordered that this blood product be administered to this patient. She administered the blood product to the patient, and she never received any verbal order from Dr. Schreck or Dr. Macon to do so. She admitted that her license doesn't permit her to do this, and she admitted that Beaumont has two policies, the nursing policy and then another OR policy that prohibits her from doing this. But she did it anyway. And when Dr. Schreck found out after the surgery, he, according to his testimony, complained to every supervisor in that operating room because it was a severe enough situation that he felt it needed to be discussed and remedied because it's a very – Dr. Schreck does not administer blood products in his traditional hip replacement surgeries. It's very unusual, and for him to have his patient receive blood products was very significant. So – and also, he didn't think – in hindsight, he, looking at the case, did not think that the patient needed blood, and Dr. Macon, the anesthesiologist, didn't think that the plaintiff needed blood. So to say there was no investigation done here is not accurate. It was reviewed, and both physicians involved indicated that the patient did not need blood products. Then he later said she shouldn't be fired for that, right? That was his view. His view was that he didn't want her fired. As was noted earlier, Dr. Schreck doesn't work for Beaumont Hospital. He's also not the only surgeon that plaintiff provided services to. She was the CRNA for lots of surgeons. So as Dr. Macon testified, whether to terminate or discipline someone for that is a nursing decision. It's not a doctor's decision. And also, Dr. Schreck was not aware of the prior incidents. She was not aware of the medication incident, and he also was not obviously aware of the – What about this question of the charge that ultimately caused her firing, dropping these earlier incidents? Your colleague laid some of that out. Is that correct, and what's your take on it? I think, Judge Gibbons, as I was listening to the questioning, the removal of, in the cases to the medication, did not refer to the earlier epidural situation? No. No. What happened when they investigated the incident, the blood incident, and they were trying to figure out why she gave this blood, there was a view of some of the practitioners that it was in fact plaintiff's choice of anesthesia that caused, and the amount that was given that caused the patient's blood pressure to lower. And because the patient's blood pressure was lower, then the blood was given. That was investigated. There was a different – and that was written in the original corrective action. Through the grievance process, it was determined that different practitioners had a different view of that. Some practitioners thought that it was the appropriate amount of medication to be given because obviously they go through M&Ms and things like that. Other practitioners thought, no, it was not an appropriate amount. So they removed – Do you think the nurse is the one choosing the amount to give? In some cases, yes. And then because Dr. Makin doesn't stay in the room the whole time, so if there are changes or fluctuations, yes, a CRNA does have special training in order to do that. Am I remembering correctly that this was a hip replacement? Yes. And so the nurse decides how much anesthesia you get if you're going to have a hip replacement? They start at the beginning of the procedure with the CRNA and the anesthesiologist consulting about the initial amounts. And then as it goes forward, the CRNA is licensed and does have the training to make those decisions as to whether or not – and that was – How much anesthesia or how much blood? Anesthesia. It was the anesthesia mix. There was a thought of the anesthesia mix having caused the blood pressure to lower and then administering the blood to try to raise the blood pressure because there was a dispute among the practitioners as to whether or not the anesthesia could have done that. That seems a little anomalous to have the nurse properly deciding how much anesthesia you get but not having the authority to decide about the blood transfusion. I mean, that has nothing to do with the outcome. It just seems odd to me. Yes. Well, to go back to the original question, because of that, they did remove from the corrective action any discussion of the amount and types of anesthesia given, and they just then focused on the administering of the blood product because there was no question there that that – But then did they or did they not consider or advert to the giving of the wrong in the epidural incident? Sure. They definitely considered that. Plaintiff received, as you should have – Would we see that on the form? Because I misunderstood at least whether your adversary was saying that that had been removed. Oh, no. You wouldn't see – The way you would see that referenced on the corrective action form is just an indication that it's a third step, suggesting that there had been a prior second step. So the corrective action is in her file, and it's part of the sequence. It was provided to the grievance panel. It was reviewed by the people making the termination decision, though that certainly was considered. And, in fact, after a plaintiff had received that corrective action, she was told that she was going – monitored and that any further medication errors or errors of this sort, like the blood transfusion, could result in her termination. So she was well aware of that fact. Going to the retaliation claim, this court touched on this. Plaintiff had received two corrective actions before she went to Human Resources to complain about these statements that were allegedly made 12 and 18 months earlier about her age and about Ms. Galinsky apparently wanting to terminate two of the older CRNAs. As this court noted, the wheels were in motion for this discipline and for this situation prior to plaintiff ever complaining about any sort of inappropriate comments that were made to her. The only thing that occurred after she made that complaint was this administration of the blood product. So the other two issues that – the other two situations that plaintiff was involved in could not have been retaliatory because they occurred prior to the protected activity. The only thing that occurred after the protected activity was the blood transfusion. And, again, there's no dispute in this record that it happened and that it was a violation of policy and procedure. And what was Galinsky's exact role in the actual firing decision? The way that it works is that, as the administrator, she would prepare the corrective action and then consult with her administrator. If there's a termination, she prepares the corrective action, submits it to her administrator, it's reviewed, signed off on, and then it's issued by the hospital. Then what happens is the plaintiff can grieve that, and that grievance goes through – it will go through Ms. Galinsky, the director above Ms. Galinsky, and then a three-member grievance panel, including hospital counsel, the HR director, and then just another employee of the hospital that sits on the panel. So in the end, she wasn't fired until the grievance panel acted, or was that after she was actually fired? It was after the termination decision was issued, then the termination was affirmed or upheld by the grievance panel. So she was not working at the time that the grievance was resolved. Okay. Correct. So as it relates to retaliation, this court also noted that, that the termination occurred after the time that she complained. There is no evidence in this record at all to suggest that anybody at Beaumont had a retaliatory motive. No one at Beaumont mentioned these complaints that plaintiff had made. Nobody told her that she shouldn't have made them. After she made them, nobody started harassing her, or like some of these cases that have been cited, or picking on her or criticizing her work or making comments to her. She proceeded to work just as she had prior to making the comment. Nothing at all happened to her until this very serious error made in the operating room. So as this court had noted, there is no evidence in this record at all even suggesting a retaliatory motive. And whether it's two weeks, three weeks, a month, there's got to be some evidence of retaliation absent temporal proximity, and there is not in this case. Regardless of whether you're using a but-for or a significant cause factor, there's got to be some evidence of retaliation absent temporal proximity, and there's not in this case. Now as it relates to the age discrimination claim, this court has said in the Carter case just very recently that to establish even a prima facie case, the plaintiff has to show she was treated differently than a similarly situated younger employee. Plaintiff has not demonstrated that here. Now plaintiff argues that she's not required to do that, that the similarly situated standard has somehow been abandoned by the court. I disagree with that. I think this court has recently said that in the Carter case again that that is the standard. But nonetheless, you still have to have some evidence of age bias, and we have no evidence of age bias in this case whatsoever. The statement that Ms. Galinsky allegedly made about terminating older employees, that's not properly before this court because it's based on double hearsay. Plaintiff did not hear Ms. Galinsky say it. She heard it from another employee who heard it from a physician. So we've got two levels of hearsay, and that statement should not be before the court, and Ms. Galinsky has denied making that statement. The other statement about the 16-hour shifts, if you look at plaintiff's testimony, she did not testify that Ms. Galinsky told her she was too old to work 16-hour shifts. Plaintiff was having her evaluation. She had chosen not to work 16-hour shifts anymore because she said it wasn't the way she wanted to live her life. It was too harsh of a shift, and Ms. Galinsky, according to plaintiff, said, are you getting too old to work 16-hour shifts? It wasn't as if Ms. Galinsky was telling her you are too old to work 16-hour shifts or you're too old to work at all. Apparently there was some discussion going on, and although Ms. Galinsky denies saying it, plaintiff says she asked me if I was too old to work 16-hour shifts. That's a big difference than telling someone you are too old, and certainly it's not evidence of age animus. Besides those two statements, there is nothing else in this case to suggest any age animus whatsoever. No one made comments to plaintiff. Nobody treated a younger employee any differently than they treated her. Regardless, again, of what standard you're going to use and whether you have to use similarly situated, at the end of the day you've got to have something to show that it was because of age, and there's no evidence in this case that it was because of age. Now, going to the issue of the... We talked about Dr. Shrek didn't want her fired. It's important to note that Dr. Macon, who is the anesthesiologist, disagreed that blood was needed in this case, and plaintiff misrepresents Dr. Macon's testimony throughout the brief saying that Dr. Macon agreed that the blood was indicated. That is not what Dr. Macon said. Plaintiff actually had gone to Dr. Macon after the surgery and said, will you sign this order for me, and Dr. Macon refused to sign the order. So Dr. Macon did not agree that blood was indicated, and Dr. Macon did not tell the plaintiff that she should have given the blood. There's also this discussion about it. Plaintiff has said that it was really the nurse in the operating room that was the one who was responsible for ordering this blood, and she had signed a document that said, well, yes, the physician ordered the blood. Well, her testimony was very clear when we asked her about that. She said, I only signed the bottom of that paper because when I'm getting a CRNA asking me for blood, my assumption is that CRNA has gone through what is our established protocol that we do not vary from. You ask the physician if the physician agrees that blood needs to be ordered. The physician says yes or no. Then the CRNA signs off on it. She gives me the paperwork. I go and I get the blood from the blood bank. So Nurse Kendall had said, I only signed that because I just assumed that Dr. Schreck said yes because she's asking me to order blood. I never heard him say that he wanted blood. So it wasn't Nurse Kendall's job to communicate with Dr. Schreck. The communication was to be through Dr. Schreck and the plaintiff, and then plaintiff was then to communicate it to the nurse. And regardless, plaintiff admitted time and time again that Dr. Schreck never ordered the blood and that she did that on her own. So what Nurse Kendall said is really of no import. As to Mr. Schroeder, he was not working at Beaumont. There's no indication he ever worked for Dr. Schreck. And if he administered blood as a CRNA without getting a doctor's order, that doesn't mean that that wasn't the policy, but we don't really have any idea why Mr. Schroeder's affidavit would be of any import here at all. He wasn't even working at Beaumont at the time that this all happened. So to sum it up, we have an age discrimination and a retaliation case where there's no evidence of age bias. There's no evidence of retaliatory motive. We have a plaintiff who is admitted to all of the discipline that admitted to engaging in the conduct for all the discipline for which she received. She can't show anyone who was treated any differently than she was, and there's no evidence that the reasons given for her termination were a pretext for retaliation or for age discrimination. So we would ask this court to affirm the decision of the district court. Thank you. Counsel? Yes. I'm sorry if I indicated to the court somehow that it was the write-up regarding the anesthesia care and the hip surgery that was written up and removed. What you basically have, though, in that situation was Ms. Galinsky was the quarterback. She was advised of the complaint that Ms. Flonis made in February. Ms. Galinsky took Dr. Schreck's concerns, turned it into a complaint, decided that it should warrant termination, added to it a whole section on improper care, and basically was the quarterback that carried the termination down the field. With respect to the Dr. Macon issue, Ms. Flonis testified. This illustrates why this case should not have been decided on summary disposition. Ms. Flonis testified unequivocally that Dr. Macon told her that the blood was, in fact, needed. Dr. Macon indicated, I never told her that. It's a question of fact as to what occurred here. But per Ms. Flonis' testimony, there was an indication that blood was needed. It's also important to note that blood was ordered. Pre-surgery, the anesthesiologist, they have a standing order for all the drugs that may be needed, and one of them is blood so that blood is ready in case blood has to, in fact, be given. So the way it works is blood was ordered for this procedure. In terms of when it was actually given, Ms. Flonis operated in a manner that was consistent with how Mr. Schroeder said we operated, consistent with how Mr. Repp, another nurse, said we do procedure, and Ms. Angele, who was a circulating nurse, saw nothing odd or unusual and assumed based upon what she heard and what happened in the operating room that this was a normal procedure. Did Dr. Schreck say to her, get the blood? No. But there's a question of fact as to whether that, in fact, is how it's done and whether that is, in fact, a breach of policy. No other nurse, CRNA, has ever been disciplined for this type of event because they chose to use this event, as Ms. Galinsky did, as her means of getting even. Do we know that it happened at any other time? It happens all the time, according to three, that this is a standard. All three of these, Ms. Flonis, Mr. Schroeder's affidavit, Mr. Repp, who was a circulator, all said this is the standard of what happens under these types of circumstances. The important point is that people give blood when it hasn't been ordered. They give blood in the presence of the doctor, and generally if the doctor thinks it's inappropriate, they stop him. The doctor is concentrating on the surgery. He's not saying add this, as you pointed out, add this anesthesia, do this, whatever. If the CRNA thinks blood is appropriate, she says blood should be ordered. They type, they match. All this is going on in front of the surgeon, and they assume that given the fact that blood was preordered. It's clear that Schreck didn't. He didn't say, no, he did not say give blood. I cannot represent that. It's clear that he sort of didn't agree with how things went. He didn't after the fact. I agree with you. Is there an indication that some other case where some doctor had not agreed with it, nothing happened? I don't know. I cannot add something to the record like that. Okay. Thank you. The only point is this is the straw that it's a question of fact as to whether Ms. Flonis' age and her whatever. We've got that. Okay. Thank you. Thank you. Have a good day. The case will be submitted. The clerk may call the next case.